Monica S. Call (11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111
(801) 578-6988

Martha Brewer Motley (*pro hac vice application forthcoming*)
mbmotley@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
(614) 464-5626
*Attorneys for Allergy Research Group LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ALLERGY RESEARCH GROUP LLC<br>a Delaware limited liability company<br><br>Plaintiff,<br><br>v.<br><br>REZ CANDLES INC<br>a Delaware corporation<br><br>and,<br><br>REZA DAVACHI<br>an individual<br><br>and,<br><br>JOHN DOES, 1-10,<br><br>Defendants. | **COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiff Allergy Research Group, a Delaware limited liability company ("Plaintiff" or

"ARG"), brings this action against Defendants Rez Candles Inc ("Rez Candles Inc"), Reza

Davachi ("Davachi"), and John Does 1-10 (collectively, "Defendants") for trademark infringement

in violation of the Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham

Act, 15 U.S.C. § 1125(a); common law trademark infringement; deceptive trade practices in violation of Utah Code Ann. § 13-11a-3, unfair competition in violation of Utah Code Ann. § 13-5a-102, and tortious interference with contracts, and alleges as follows.  These claims arise from Defendants' misappropriation of ARG's trademarks in conjunction with Defendants' unlawful and unauthorized sale of non-genuine products bearing ARG's trademarks on the Internet.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.

2.      Defendant Rez Candles Inc is a corporation formed under the laws of Delaware with its principal place of business in Damascus, Maryland.  According to records of the Maryland Department of Assessments & Taxation, Defendant Rez Candles Inc's registered agent address is 24125 Preakness Drive, Damascus, Maryland 20872.

3.      Defendant Davachi is a natural person and the owner, operator, and registered agent for Defendant Rez Candles Inc.  Upon information and belief, Defendant Davachi resides at 26212 Ridge Road, Damascus, Maryland 20872.

4.      Defendants operate a third-party storefront on www.amazon.com ("Amazon") that is currently called "River of Human Health" with Merchant ID A35CSG8GBUTFQU.

5.      Defendants operate a website at https://theoasisofhealth.com/ that is currently called "Oasis of Health" ("Website").

6.      The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise, of Defendants John Does 1 through 10 ("Doe Defendants") are unknown to ARG.  Therefore, ARG sues these Defendants by a fictitious name.  ARG is informed and

believes, and on that basis alleges, that the Doe Defendants include persons and entities assisting or acting in connection with the actions complained of herein and include persons and entities that are responsible in some manner for the acts, occurrences and liability hereinafter alleged and referenced. The Doe Defendants are unknown natural persons and/or corporations/business entities that unlawfully acquired, distributed, or sold products bearing ARG's trademarks. When the true names, involvement, and capacities of these parties are ascertained, ARG will seek leave to amend this Complaint accordingly.

## JURISDICTION

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, and 28 U.S.C. § 1367. Plaintiff's claims are predicated on 15 U.S.C. §§ 1114 and 1125(a) and (c), and related claims under state law.

8.     This Court has personal jurisdiction over Defendants because they have sold, distributed, offered for sale, and advertised goods in Utah, and directed their tortious activities toward Utah by engaging in actions and infringing on ARG's trademarks with the knowledge that their actions would likely injure ARG in Utah. Defendants have caused injury to ARG in Utah by acts in Utah, including the sale, distribution, and advertising of non-genuine products bearing ARG's trademarks in Utah. Defendants have also caused injury to ARG in Utah through acts outside of Utah while also (a) engaging in solicitation and service activities in Utah, and (b) selling products into Utah that were used within Utah in the ordinary course of trade.

9.     Defendants have created an interactive storefront on Amazon called "River of Human Health." Through this interactive storefront, Defendants actively advertise, market, sell, ship, and distribute infringing products bearing ARG's trademarks in Utah and to Utah residents.

Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

10.     Defendants' activities in Utah have been significant and they have made substantial and regular sales of infringing products bearing ARG's trademarks to customers in Utah. Defendants have sold, and continue to regularly sell, additional infringing products bearing ARG's trademarks into Utah and to Utah residents.

## VENUE

11.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### ARG & Its Trademarks

12.     ARG has been a leading developer of nutritional and dietary supplements for over forty years.

13.     Physicians and healthcare practitioners around the world depend on ARG for their patients' nutritional support. Originating with the ground-breaking oxidant/antioxidant work of Stephen Levine, Ph.D., ARG was one of the first brands to introduce truly hypoallergenic products to the market.

14.     Since 1979, ARG has been trusted by consumers as a safety-conscious brand, and has implemented strict quality control procedures in every stage of production, including inspection of raw materials, manufacturing, packaging, and storing.  ARG is licensed by the State

of Utah Department of Agriculture and Food, Certificate of Registration for Food Establishment number 190455 and US FDA registration number 19516500330.

15.     Nattokinase NSK-SD®, the first product containing the nattokinase enzyme that ARG introduced to the U.S. market, has established standardization and quality levels for all other nattokinase enzyme products.

16.     Additionally, ARG's glandular products are derived from government-inspected, range-fed animals, raised in New Zealand and Australia under the strictest government regulations. ARG's Tocomin SupraBio Tocotrienol products are 100% non-GMO, non-soy, Kosher and Halal certified from a pure palm mixed tocotrienol complex, obtained using sustainable agriculture from a founding member of the Roundtable on Sustainable Palm Oil (RSPO).

17.     ARG fully discloses all ingredients, both active and inactive, on every product label, so doctors can make fully informed choices for their patients' nutritional support.  ARG defines hypoallergenic as "free of all common allergens", specifically, wheat, corn, soy, gluten, yeast, dairy, eggs, fish, crustacean shellfish, tree nuts, and peanuts.  Many very sensitive individuals who react to supplements in general are able to tolerate ARG's products.

18.     ARG has consistently pioneered new breakthroughs in nutritional supplements. ARG's in-house Research and Development team has decades of experience in formulating original and leading-edge products to support optimal health.  Working with ARG's certified manufacturers, ARG continues to develop technologies that maximize product delivery, absorbency, and effectiveness, such as micronized particles and lipid matrix release.

19.     ARG makes products under the Allergy Research Group, NutraCology, and Optimox brands.

20.     ARG products are available exclusively through its website, https://www.allergyresearchgroup.com/, through websites for its various brands, such as https://www.nutricology.com/, and through distributors, resellers, and retailers who are expressly authorized by ARG to sell in their brick-and-mortar locations and/or on the Internet (distributors, resellers, and retailers hereafter "Authorized Sellers").

21.     ARG devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.

22.     Genuine ARG products are packaged in a manner to ensure their safety and integrity, thereby allowing customers to receive only the undamaged, quality products that they expect from ARG.

23.     On the consumer side, ARG also offers its customers general and product-specific use instructions.

24.     On the distribution side, ARG's quality control consists of ensuring that its products are distributed only through ARG itself or through ARG's Authorized Sellers who must follow ARG's quality controls and are accountable to ARG for any quality issues.  By distributing products exclusively in this manner, ARG is better able to control the quality and integrity of its products and ensure that customers receive accurate information about them.

25.     To promote and protect its brands, ARG has registered numerous trademarks with the United States Patent and Trademark Office with respect to its brands and products, including, ALLERGY RESEARCH GROUP® (U.S. Trademark Registration No. 5,882,674), NUTRICOLOGY® (U.S. Trademark Registration No. 4,160,640), and OPTIMOX® (U.S. Trademark Registration No. 4,940,920) (collectively, the "ARG Registered Trademarks").

26.     The registration for each of the ARG Registered Trademarks is valid, subsisting, and in full force and effect.

27.     ARG actively uses and markets the ARG Registered Trademarks in commerce.

28.     Consumers recognize the ARG Registered Trademarks as being associated with ARG.

29.     Due to the quality and exclusive distribution of ARG's products, and because ARG is recognized as the source of high-quality products, the ARG Registered Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to ARG Product Quality**

30.     E-commerce retail sales have exploded over the past decade.  From Q3 2010 to Q3 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 4.6% to 14.3%.  *See* Federal Reserve Bank of St. Louis, *E-Commerce Retail Sales as a Percent of Total Sales* (January 1, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

31.     In 2019, consumers spent over $600 billion online with U.S. merchants, up more than 14% from the year before.  *See* Digital Commerce 360, *U.S. ecommerce sales grow 15.0% in 2018* (Feb. 19, 2020), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.  This massive growth is being driven largely by the growth of online marketplaces.  Amazon alone accounts for 36.9% of online retail, or over $200 billion in sales per year.

32.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

33.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

34.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

35.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products

retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

36.     Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

37.     For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

38.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of*

*fakes*, The Washington Post, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

39.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

40.     In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.  Amazon

conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

41.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

42.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

43.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

44.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

45.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

46.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

47.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

48.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

49.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness .com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

50.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised.  However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Therefore, online consumers rely more on brand reputation and reviews.

51.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

52.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

### ARG Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers

53.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing.  These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

54.     ARG has been a victim of the issues caused by unauthorized sellers on online marketplaces.  Numerous consumers who purchased ARG products from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, defective, discolored, or of otherwise poor quality.

55.     For example, many customers have complained of receiving ARG–branded products purchased on Amazon that are discolored and raise questions about authenticity:



56.     Several customers have also complained of receiving damaged products or products apparently not subject to proper quality controls:



57.   The foregoing reviews are only a small sample of the negative reviews of ARG products that have been posted on the Amazon platform.

58.   Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of

products bearing the ARG Trademarks on Amazon and are not subject to ARG's quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of ARG products that appear on the Amazon website—were written by customers who purchased products bearing the ARG Trademarks from Defendants.

**ARG Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented By Online Marketplaces, Protect the Value of the ARG Trademarks, and Ensure Customers Receive the Genuine, High Quality Products They Expect From ARG**

59.    The above reviews show how sales of poor-quality ARG products disappoint ARG's consumers and cause significant harm to the reputation and goodwill of ARG and its family of brands.  To protect itself and consumers from these harms, ARG implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

60.    ARG's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the ARG Registered Trademarks by unauthorized sellers like Defendants who do not abide by ARG's quality controls.  The goal of ARG's quality control program is to ensure that consumers who buy ARG products, including ones buying online, receive the high-quality products and services that they expect with the ARG name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the ARG brand.

61.     ARG abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

62.     ARG's ability to exercise its quality controls is essential to the integrity and quality of ARG products, as well as the value of the ARG Registered Trademarks and other intellectual property.

63.     ARG's quality controls begin with requiring that all outside sales of its products take place through ARG's own websites or through Authorized Sellers.  This basic step ensures that everyone who is selling ARG products is ultimately subject to ARG's quality control requirements.

64.     ARG carefully vets prospective Authorized Sellers to ensure that only those applicants with a reputation for and a commitment to quality are permitted to become Authorized Sellers of ARG products.

65.     Authorized Sellers are required by contract to sell products only in certain channels and to abide by ARG's policies and procedures, including, without limitation, the Authorized Retailer Policy, the Authorized Distributor Policy, and the Authorized Reseller Policy (collectively, the "ARG Rules").

66.     Among other conditions, the ARG Rules require Authorized Sellers to purchase ARG products only from ARG directly or authorized distributors approved by ARG.  This restriction ensures that the chain of custody can be established for all ARG products sold by Authorized Sellers, and thus prevents counterfeits, secondhand goods, or other low-quality products from entering into the distribution chain.  The ARG Rules also require Authorized Sellers

to sell only to end users or to resellers approved by ARG, thus guarding against leaks in the chain of distribution.

67.     The ARG Rules also require Authorized Sellers to inspect all shipments of ARG products and report any problems to ARG promptly.  Authorized Sellers must further inspect the products prior to sale.  These inspections minimize the risk that consumers receive damaged products, or products that are different from what they ordered.

68.     The ARG Rules prohibit Authorized Sellers from altering any ARG products or packaging without ARG's consent, or selling ARG products outside of approved ARG-branded packaging.

69.     The ARG Rules also require Authorized Sellers to be familiar with product-specific information, such as relevant expiration dates, and to be available to respond to customer questions and concerns both before and after the sale of ARG products.  Furthermore, Authorized Sellers are required to assist with recalls and other consumer-safety information efforts.  These requirements ensure that consumers get all the information they need and service they expect related to ARG products.

70.     Authorized Sellers are subject to auditing and review upon request by ARG to ensure that the ARG Rules are being followed.

71.     It is only by limiting authorized sales to Authorized Sellers who have access to, and are required to follow, the ARG Rules that ARG is able to ensure the satisfaction of consumers and to maintain the integrity and reputation of the ARG brand.

72.     ARG's quality control and customer service requirements are legitimate and substantial and have been implemented so that ARG can control the quality of goods manufactured

and sold under the ARG Trademarks, to protect consumers as well as the value and goodwill associated with the ARG Trademarks.

73.     ARG's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a ARG product that they were considering buying was being sold by an Authorized Seller who is subject to ARG's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, ARG's quality controls and over whom ARG is unable to exercise its quality controls.

### Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, ARG Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

74.     ARG products sold online are more susceptible to quality and authenticity problems as consumers cannot see the products before they buy them.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they unauthorized sellers and many sellers may share a single product listing page.

75.     Accordingly, ARG has placed additional quality control requirements on sellers operating online, which are in addition to those that apply to all Authorized Sellers.

76.     The ARG Rules allow Authorized Sellers to sell ARG products on the Internet only through approved channels.  These rules allow ARG to oversee all Authorized Sellers who sell ARG products online.

77.     The ARG Rules specify that Authorized Sellers who are also authorized retailers are permitted to sell ARG products through their own proprietary websites ("Permissible Public

Websites").  The ARG Rules provide certain minimum criteria that Authorized Sellers must adhere to when operating Permissible Public Websites, including that they must operate Permissible Public Websites in their own individual or legal names, they must provide mechanisms for customer feedback, and they must, for ARG product listings, only use images and product descriptions provided by ARG.  These requirements help ARG ensure product integrity and protect the customer experience.  Permissible Websites do not include storefronts on online marketplace websites like Amazon.

78.     ARG also allows certain of its authorized distributors to sell ARG products online through websites that require customers to create accounts to log-in and purchase products, subject to certain rules.

79.     ARG additionally authorizes certain of its authorized resellers to sell ARG products through ePharmacies operated by ARG's authorized distributors, subject to certain restrictions.

80.     ARG does not permit any other online sales of ARG products unless the seller has received ARG's written approval to sell on an Authorized Website.  An "Authorized Website" is a website that ARG has specifically approved an Authorized Seller to use to sell ARG products. Authorized Sellers who do not meet the requirements for being able to sell on a Permissible Public Website (*i.e.*, those that are not authorized retailers) may sell ARG products online only through Authorized Websites.

81.     To submit a proposed Authorized Website for consideration by ARG, an Authorized Seller must submit an application that provides various items of information about its business and the website(s) where it wishes to sell ARG products.  ARG vets its Authorized Sellers

that submit applications as well as the websites proposed by these sellers to ensure that they meet ARG's criteria and will represent the ARG brand properly.

82.     For ARG to exercise its quality controls over products sold online, it must know what websites its Authorized Sellers are selling on and under what names.  Accordingly, the ARG Rules prohibit Authorized Sellers from selling anonymously online and instead require them to state their business name and current contact information on all websites where they sell.  This requirement allows ARG and consumers of ARG products to address any quality issues or negative reviews that arise.  This requirement also allows ARG to protect the public from the sale of poor quality and counterfeit ARG products because it allows for easy detection of any Authorized Seller that sells poor quality or inauthentic goods.

83.     Authorized Sellers that sell ARG products on Permissible Websites or Authorized Websites ("Authorized Online Sellers") must also adhere to additional requirements under the ARG Rules.

84.     For example, Authorized Online Sellers must use images of ARG products provided or approved by ARG and keep product descriptions up to date.

85.     Authorized Online Sellers are prohibited from representing or advertising any ARG product as "new" that has been returned, repackaged, or otherwise been altered by a customer. When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new."  The ARG Rules prohibit Authorized Online Sellers from allowing or carrying out this practice, to ensure that customers receive the high-quality ARG products that customers expect when they purchase "new" products.

86.     Unless otherwise approved by ARG, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for ARG products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive ARG products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet ARG's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of ARG's quality controls.

87.     All websites through which Authorized Online Sellers sell ARG products must comply with all applicable data security, accessibility, and privacy requirements.

88.     In addition, Authorized Sellers who are approved to sell on Authorized Websites may sell ARG products only on the websites and under the name(s) specifically approved by ARG. At ARG's request, Authorized Sellers must provide access to and copies of all web pages that make up Authorized Websites where Authorized Sellers are selling ARG products.

89.     Authorized Websites must have a mechanism for receiving customer feedback, and Authorized Sellers who sell on Authorized Websites must take appropriate steps to address any feedback received.  Authorized Sellers must also: (i) keep copies of all information related to customer feedback regarding ARG products and Authorized Sellers' responses; (ii) provide this information to ARG upon request; and (iii) cooperate with ARG in investigating negative online reviews related to sales of ARG products.

90.     The additional quality-control requirements that ARG imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow ARG to carefully

control the quality of ARG products that are sold on the Internet and address any quality issues that arise.

91.    ARG's additional quality controls for online sales are also material, as they have been implemented to ensure that consumers who purchase ARG products on the Internet receive genuine, high-quality ARG products that abide by ARG's quality controls.  Consumers purchasing ARG products on the Internet would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, ARG's quality controls.

### ARG Monitors and Audits Its Authorized Sellers to Ensure They Comply with ARG's Quality-Control Requirements

92.    ARG also regularly monitors and audits its Authorized Online Sellers, to ensure that these sellers and their websites are complying with ARG's quality-control requirements.  ARG carries out these auditing and monitoring actions pursuant to an internal program called the ARG Online Quality Control Auditing Program ("Auditing Program").

93.    Under the Auditing Program, ARG periodically conducts test purchases of ARG products from the Authorized Websites and Permissible Websites.  If ARG discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites or Permissible Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service— ARG communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

**Genuine ARG Products Come with ARG's Satisfaction Guarantee;
Defendants' Products Do Not**

94.     ARG also provides customers who purchase genuine ARG products from ARG itself or Authorized Sellers the ARG Satisfaction Guarantee (the "Satisfaction Guarantee").

95.     The Satisfaction Guarantee allows a customer who is dissatisfied with an ARG product to request a replacement product or refund within 60 days of their original purchase.  *See Allergy Research Group LLC 60-Day Satisfaction Guarantee, available at* https://www.allergyresearchgroup.com/guarantee.  Such statements are incorporated herein.

96.     As discussed above, ARG cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to ARG's quality controls.  For this reason, the ARG Satisfaction Guarantee does not cover ARG products sold by unauthorized sellers, like Defendants, who do not comply with ARG's quality controls and standards.  Indeed, the Satisfaction Guarantee specifically states: "not available for products purchased from unauthorized sellers."

97.     The ARG Satisfaction Guarantee is a material component of genuine ARG products.  Consumers who purchase ARG products with the ARG Satisfaction Guarantee receive the peace of mind that they are receiving a good quality product, that ARG stands behind the product, and that if a defect occurs, they will have the ability to get a refund or a replacement.

98.     Consumers would find it material and relevant to their purchasing decision to know whether an ARG product they were considering buying was covered by the ARG Satisfaction

Guarantee.  If a consumer knew a product did not come with the ARG Satisfaction Guarantee, the consumer would be less likely to purchase the product.

### Defendants Are Aware of Online Marketplaces and the Policies That Companies Adopt Around Online Marketplaces

99.     ARG polices the sale of its products online.  In the course of monitoring online listings of ARG products, ARG discovered a high volume of products bearing the ARG Registered Trademarks being illegally sold by Defendants on Amazon under the storefront name "River of Human Health" in or about September 2020.

100.     After ARG discovered products bearing the ARG Registered Trademarks being illegally sold on the Amazon storefront, ARG investigated the storefront to determine who was operating the storefront.

101.     ARG identified Defendants as the owners and operators of the "River of Human Health" Amazon storefront.

102.     ARG also identified Defendants as the owners and operators of the "Oasis of Health" website.

103.     Through its investigation, ARG discovered that Defendants were previous customers of ARG that were not approved for online sales by ARG.  Defendants were notified that they were not approved for online sales in or about July 2020 and were instructed at that time to cease any continuing sales of ARG Products.

104.     During its investigation of Defendants, ARG also learned that Defendant Davachi had previously been a customer of several reputable distributors, but had been blocked from purchasing from such distributors for violation of those distributors' policies.

105.     Defendant Davachi was found to have subsequently used false names on accounts with those distributors in order to conceal Defendant Davachi's identity and to preclude ARG from enforcing the ARG Rules.

106.     As ARG was researching Defendant Davachi in light of the foregoing fraudulent conduct, ARG discovered that Defendant Davachi's use of falsified credentials was not his first instance of Internet-based fraud.  Public records reflect that Defendant Davachi had previously pleaded guilty for participation in what a U.S. Attorney called "one of the largest software piracy schemes ever prosecuted by the U.S. Department of Justice" (the "Conspiracy").  *Six Defendants Plead Guilty to $100 Million Software Piracy Scheme*, U.S. Dep't of Justice (Dec. 17, 2015), https://www.justice.gov/usao-wdmo/pr/six-defendants-plead-guilty-100-million-software-piracy-scheme.  Defendant Davachi admitted that as part of the Conspiracy, he paid Chinese counterfeiters hundreds of thousands of dollars for unauthorized and counterfeit software.  *Id.*  Defendant Davachi also admitted to creating a fake charity organization for selling the counterfeit software on online marketplace website eBay.  *Id.*; *see also U.S. v. Davachi,* 4:15-cr-00346-DGK (W.D. Mo. 2015), transfer of jurisdiction, 8:18-cr-00561-PWG (D. Md. 2018).

107.     Defendants' high-volume of Amazon sales and the foregoing fraud give ARG reason to believe that Defendants are and were selling ARG-branded products obtained from unauthorized sellers on its Amazon storefront.

### Defendants are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the ARG Trademarks

108.     Although Defendants were notified in July 2020 that their sales of ARG Products were not lawful, Defendants continued selling ARG Products.

109.    As a result of this continued misconduct, on or about December 1, 2020, counsel for ARG sent Defendants a cease-and-desist letter, demanding that they immediately cease selling products bearing the ARG Registered Trademarks.

110.    This letter further notified Defendants that they were injuring ARG in Utah through their illegal actions and that they would be subject to personal jurisdiction in Utah if they continued to engage in their conduct.

111.    This letter also notified Defendants that ARG had contracts with its Authorized Sellers that restrict sales to end-user consumers through approved channels or resellers who meet certain requirements as dictated by ARG, and that Defendants would be tortiously interfering with those contracts if they continued to purchase products bearing the ARG Registered Trademarks from Authorized Sellers for resale outside of ARG's established distribution channels.

112.    Defendants did not respond to this letter and continued to sell products bearing the ARG Registered Trademarks on the "River of Human Health" storefront and on the Website.

113.    Counsel for ARG sent Defendants a second cease-and-desist letter on or about December 16, 2020.

114.    Defendants did not respond to this second cease-and-desist letter.

115.    Counsel for ARG sent Defendants a third cease-and-desist letter on December 31, 2020.

116.    Defendants did not respond to this third cease-and-desist letter.

117.    As of the time of filing, Defendants have not responded to any of ARG's letters and continue to advertise and sell products bearing the ARG Trademarks through their "River of Human Health" Amazon storefront and on the Website.

118.     Through their highly interactive "River of Human Health" storefront on Amazon and the Website, Defendants have sold products bearing the ARG Trademarks to residents of Utah through the regular course of business.

119.     Defendants' disregard of ARG's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants' Are Not Subject To, Do Not Abide By, and Interfere with ARG's Quality Control Requirements**

120.     Defendants are not Authorized Sellers of ARG products, and do not abide by ARG's quality control and customer service requirements that ARG requires Authorized Sellers to follow.

121.     Defendants also interfere with ARG's quality controls because ARG is unable to audit Defendants' practices.  Therefore, among other things, ARG cannot know if Defendants are sourcing products from reliable sources, inspecting products upon receipt, avoiding risky fulfillment practices such as commingling, ensuring that products are sold only in official and unaltered ARG packaging, or providing good customer service.  Defendants' practices thus risk introducing counterfeit and other non-genuine products bearing the ARG Registered Trademarks into the stream of commerce.

122.     Defendants' failure to abide by the ARG Rules prevents ARG from exercising control over the quality of products Defendants sell bearing the ARG Trademarks.  Unlike with its Authorized Online Sellers, ARG cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

123.    Because the products Defendants sell bearing the ARG Trademarks are not subject to, do not abide by, and interfere with ARG's quality control and customer service requirements, they are not genuine ARG products.

**Defendants' Products Do Not Come With the Satisfaction Guarantee**

124.    As set forth above, genuine ARG products purchased from ARG or Authorized Sellers come with the Satisfaction Guarantee because they comply with ARG's quality controls, and this Satisfaction Guarantee is a material part of what consumers expect when they purchase ARG products.

125.    Because Defendants are not Authorized Sellers of ARG products and do not comply with ARG's quality controls, the products they sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

126.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine ARG products.

127.    Defendants' unauthorized sale of non-genuine products bearing the ARG Registered Trademarks but without the Satisfaction Guarantee is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine ARG Products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With
ARG's Agreements With Its Authorized Sellers**

128.    Upon information and belief, Defendants have purchased ARG products from ARG Authorized Sellers for purposes of unlawfully infringing upon and materially damaging the

value of the ARG Registered Trademarks by reselling the products on the Internet outside of ARG's quality controls.

129.     ARG's agreements with its Authorized Sellers prohibit Authorized Sellers from selling ARG products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

130.     Defendants have known of this prohibition since July 2020, or at the latest, approximately December 1, 2020.  On that date, ARG mailed a cease-and-desist letter to Defendants explaining that ARG has agreements with all of its Authorized Sellers that prohibit them from selling ARG products to any person or entity that is not an Authorized Seller and intends to resell the products.

131.     ARG's letter also informed Defendants that, by purchasing ARG products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between ARG and its Authorized Sellers and were interfering with ARG's agreements and business relationships.

132.     ARG's December 1, 2020, letter also advised Defendants that if they continued to acquire products from ARG's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with ARG's contracts and business relationships with its Authorized Sellers.

133.     Despite being provided this information, upon information and belief, Defendants have continued to acquire ARG products from ARG's Authorized Sellers and then resold the products.

134.    Upon information and belief, Defendants do not disclose to Authorized Sellers that they intend to resell the products they purchase from Authorized Sellers.

135.    Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with ARG so that they can acquire ARG products and unlawfully infringe upon the ARG Trademarks by reselling the products.

### The Individual Defendants Are Liable

136.    ARG asserts claims against Davachi in both his individual capacity as well as his capacity as a corporate officer of Rez Candles Inc.

137.    Until it conducts discovery, ARG cannot determine whether Davachi in his individual capacity, Rez Candles Inc, or both operate the "River of Human Health" Amazon storefront and the Website.

138.    Alternatively, upon information and belief, Davachi directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing the ARG trademarks by Rez Candles Inc.  Accordingly, Davachi is personally liable for infringing activities of Rez Candles Inc without regard to piercing the corporate veil.

139.    Alternatively, upon information and belief, Rez Candles Inc follows so few corporate formalities and is so dominated by Davachi that it is merely an alter ego of Davachi. Rez Candles Inc's status as an alter ego is supported, in part, by the fact that Rez Candles Inc appears to have no officers other than Davachi.  Accordingly, ARG is entitled to pierce the corporate veil and hold Davachi personally liable for the infringing activities of Rez Candles Inc.

**ARG Has Suffered Substantial Harm as a Result of Defendants' Conduct**

140.    As set forth above, the unauthorized sale of products bearing the ARG Registered Trademarks through unauthorized sellers such as Defendants has caused significant harm to ARG brands.

141.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with ARG.  As such, Defendants' ongoing sale of non-genuine products bearing the ARG Registered Trademarks harms the ARG brand.

142.    ARG has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

143.    ARG has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

144.    ARG is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the ARG Registered Trademarks, causing continued irreparable harm to ARG's reputation, goodwill, relationships, intellectual property, and brand integrity.

145.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

146. Defendants' disregard of communications from ARG and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

147. Defendants' willful violations of the ARG Registered Trademarks and continued pattern of misconduct demonstrate intent to harm ARG.

### FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

148. ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

149. ARG is the owner of the ARG Registered Trademarks.

150. ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

151. The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

152. Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in commerce for purposes of selling non-genuine products bearing the ARG Registered Trademarks on the Internet without ARG's consent.

153. The products Defendants sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

154. The products Defendants sell bearing the ARG Registered Trademarks are materially different from genuine ARG products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that ARG has established.

155.    The products Defendants sell bearing the ARG Registered Trademarks are materially different from genuine ARG products because they do not come with the Satisfaction Guarantee, which accompanies genuine ARG products.

156.    Defendants' unauthorized sale of materially different products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine ARG products when they are not.

157.    Defendants' unauthorized sale of materially different products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with ARG when, in fact, they are not.

158.    Defendants' unauthorized use of the ARG Registered Trademarks has infringed upon and materially damaged the value of the ARG Registered Trademarks, and caused significant damage to ARG's business relationships.

159.    As a proximate result of Defendants' actions, ARG has suffered, and will continue to suffer immediate and irreparable harm.  ARG has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

160.    ARG is entitled to recover its damages caused by Defendants' infringement of the ARG Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

161.    ARG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, ARG will suffer irreparable harm.

162.    ARG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the ARG Registered Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

163.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

164.    As set forth above, Defendants are selling non-genuine products bearing the ARG Registered Trademarks that are materially different from genuine ARG products.

165.    Defendants' sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by ARG when they are not.

166.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

167.    ARG is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, ARG will suffer irreparable harm.

168.    ARG is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the ARG Registered Trademarks.

**THIRD CAUSE OF ACTION**
**Common Law Unfair Competition**

169.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks interferes with ARG's quality controls and its ability to exercise quality control over products bearing the ARG Registered Trademarks.

171.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, ARG's quality controls when, in fact, they are not.

172.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are genuine ARG products when, in fact, they are not.

173.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the ARG Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the ARG Registered Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with ARG when, in fact, they are not.

174.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine ARG products when, in fact, they are not.

175.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks and unauthorized use of the ARG Registered Trademarks in advertising infringes the ARG Registered Trademarks and constitutes unfair competition at common law.

176.    Defendants' unauthorized use of the ARG Registered Trademarks has materially damaged the value of the ARG Registered Trademarks, caused significant damage to ARG's business relations, and infringed the ARG Registered Trademarks.

177.    As a result, ARG has suffered, and continues to suffer, immediate and irreparable harm.  ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

178.    ARG is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## FOURTH CAUSE OF ACTION
### Deceptive Trade Practices
### Utah Code Ann. § 13-11a-3

179.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

180.    This claim arises under the laws of the State of Utah.

181.    ARG is the owner of the ARG Registered Trademarks.

182.    ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

183.    The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

184.    Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in interstate commerce, including through their product listings on Amazon, for purposes of advertising, promoting, and selling ARG products on the Internet without ARG's consent.

185.    Defendants' advertisements and promotions of products unlawfully using the ARG Registered Trademarks have been disseminated to the relevant purchasing public.

186.    The products Defendants advertise and sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

187.    ARG has established legitimate, substantial, and non-pretextual quality control procedures over ARG products.

188.    ARG abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

189.    ARG's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the ARG Registered Trademarks, whether the product is subject to and abides by ARG's quality controls would be relevant to the consumers' purchasing decision.

190.     The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements.

191.     The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

192.     Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are materially different from genuine ARG products.

193.     Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are not genuine ARG products.

194.     Defendants' unauthorized sale of products bearing the ARG Registered Trademarks interferes with ARG's quality controls and ability to exercise quality control over products bearing the ARG Registered Trademarks.

195.     Defendants' use of the ARG Registered Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of ARG products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with ARG when, in fact, they are not.

196.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising constitute deceptive trade practices under Utah Code Ann. § 13-11a-3.

197.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising materially damages the value of the ARG Registered Trademarks and causes significant damages to ARG's business relations.

198.    As a result of Defendants' unlawful actions, ARG has suffered, and continues to suffer immediate and irreparable harm. ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

199.    Pursuant to Utah Code Ann. § 13-11a-4(2), ARG is entitled to injunctive relief enjoining Defendants' infringing conduct, as well as damages, and attorneys' fees and costs.

200.    ARG is also entitled to punitive damages because Defendants acted willfully and maliciously toward ARG or with knowing or reckless indifference toward, and disregard of, the rights of ARG.

**FIFTH CAUSE OF ACTION**
**Unfair Competition**
**Utah Code Ann. § 13-5a-102**

201.    ARG hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

202.    This claim arises under the laws of the State of Utah.

203.    ARG is the owner of the ARG Registered Trademarks.

204.   ARG has registered the ARG Registered Trademarks with the United States Patent and Trademark Office.

205.   The ARG Registered Trademarks are valid and subsisting trademarks in full force and effect.

206.   Defendants willfully and knowingly used, and continue to use, the ARG Registered Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising promoting, and selling products bearing the ARG Registered Trademarks without the consent of ARG.

207.   Defendants' advertisements and promotions of products unlawfully using the ARG Registered Trademarks have been disseminated to the relevant purchasing public.

208.   The products Defendants advertise and sell bearing the ARG Registered Trademarks are not authorized for sale by ARG.

209.   ARG has established legitimate, substantial, and non-pretextual quality control procedures over ARG products.

210.   ARG abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

211.   The products Defendants advertise, promote, and sell are not genuine ARG products because the products are not authorized for sale by ARG and are materially different from genuine ARG products.

212.   ARG's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether

to purchase a product bearing the ARG Registered Trademarks, whether the product is subject to and abides by ARG's quality controls would be relevant to the consumers' purchasing decision.

213.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements.

214.    The products Defendants advertise, promote, and sell bearing the ARG Registered Trademarks do not come with the Satisfaction Guarantee.

215.    Because the products Defendants advertise and sell bearing the ARG are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are materially different from genuine ARG products.

216.    Because the products Defendants advertise and sell bearing the ARG Registered Trademarks are not subject to, do not abide by, and interfere with ARG's quality controls and customer service requirements, and do not come with the Satisfaction Guarantee, the products Defendants sell are not genuine ARG products.

217.    Defendants' unauthorized sale of products bearing the ARG Registered Trademarks interferes with ARG's quality controls and ability to exercise quality control over products bearing the ARG Registered Trademarks.

218.    Defendants' use of the ARG Registered Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of ARG products because it suggests that the products

Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with ARG when, in fact, they are not.

219.   Defendants' unauthorized sale of products bearing ARG Registered Trademarks and unauthorized use of ARG Registered Trademarks in advertising infringes on the ARG Registered Trademarks.

220.   Defendants' unauthorized sale of products bearing ARG Registered Trademarks and unauthorized use of ARG Registered Trademarks in advertising has materially damaged the value of the ARG Registered Trademarks and has caused significant damages to ARG's business relations.

221.   Defendants' unauthorized sale of products bearing the ARG Registered Trademarks, and unauthorized use of the ARG Registered Trademarks in advertising constitute unfair competition under Utah Code Ann. § 13-5a-102.

222.   As a result of Defendants' unlawful actions, ARG has suffered, and continues to suffer, irreparable harm. ARG has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

223.   Pursuant to Utah Code Ann. § 13-5a-103(1), ARG is entitled to actual damages, punitive damages, and attorneys' fees and costs.

224.   ARG is also entitled to punitive damages because Defendants acted willfully and maliciously toward ARG or with knowing or reckless indifference toward, and disregard of, the rights of ARG.

## SIXTH CAUSE OF ACTION
**Tortious Interference with Contractual Relations**

225.    ARG hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

226.    ARG has contracts and business relationships with its Authorized Sellers, who sell ARG products.  These contracts require ARG's Authorized Sellers to sell ARG products to end-user consumers through approved channels or resellers who meet certain requirements as dictated by ARG.

227.    Defendants are not Authorized Sellers or approved resellers of ARG products.

228.    Defendants have sold—and continue to sell—products bearing the ARG Registered Trademarks through their Amazon storefront.

229.    Based on these facts, it is plausible and a reasonable inference that Defendants acquired the products they are reselling from one or more of ARG's Authorized Sellers.

230.    Defendants knew since (at the latest) receiving ARG's December 1, 2020 cease-and-desist letter that ARG had agreements with these Authorized Sellers that prohibited unauthorized online sales and sales to unauthorized resellers, and that Defendants would be tortiously interfering with those agreements if they continued to acquire products from Authorized Sellers for resale.

231.    Defendants, without legal right, privilege, or justification, intentionally interfered with the contracts and business relationships between ARG and its Authorized Sellers by purchasing products from Authorized Sellers for the purpose of reselling products on the Internet in violation of the Authorized Sellers' contracts with ARG.

232.    Upon information and belief, Defendants interfered with ARG's contracts with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with ARG by selling to Defendants.

233.    Because Defendants have refused to disclose how they have obtained the products bearing the ARG Registered Trademarks they have resold, ARG must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants. Defendants, however, know the sources of the ARG products they have obtained and the basis for ARG's claim of tortious interference.  ARG's agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

234.    Defendants' actions have caused injury to ARG for which ARG is entitled to compensatory damages in an amount to be proven at trial.

235.    The injury to ARG is immediate and irreparable, as ARG's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

236.    ARG is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## PRAYER FOR RELIEF

WHEREFORE, ARG prays for relief and judgment as follows:

A.    Judgment in favor of ARG and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages,

liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the ARG Registered Trademarks;

ii)   Prohibiting the Enjoined Parties from using any of the ARG Registered Trademarks in any manner, including advertising on the Internet;

iii)  Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the ARG Registered Trademarks;

iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the ARG Registered Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of ARG's products, or any of the ARG Registered Trademarks;

vi)      Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the ARG Registered Trademarks which associate ARG's products or the ARG Registered Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)     Requiring the Enjoined Parties to take all action to remove the ARG Registered Trademarks from the Internet, including from the website www.amazon.com; and

viii)     Requiring the Enjoined Parties to destroy or return to ARG all products bearing the ARG Registered Trademarks in their possession, custody, or control.

C.      An award of attorneys' fees, costs, and expenses.

D.      Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, ARG demands a trial by jury on all issues so triable.

Dated: February 3, 2021

Respectfully submitted,

STOEL RIVES, LLP

*/s/ Monica S. Call*
Monica S. Call (11361)

*Attorneys for Allergy Research Group LLC*