IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ALLERGY RESEARCH GROUP LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>REZ CANDLES INC., a Delaware corporation,<br><br>Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:21-cv-73-TC-JCB |

Allergy Research Group (ARG) brought a complaint against Defendant Rez Candles (RC) asserting claims of trademark infringement, unfair competition, deceptive trade practices, and tortious inference with contractual relations.[1]  In response, RC filed three counterclaims against ARG: (1) a Sherman Act antitrust claim under 15 U.S.C. § 1 ("Concerted Refusal to Deal — Group Boycott — Authorized Sellers"); (2) "Illegal Anti-Competitive Activities" in violation of the Utah Antitrust Act; and (3) tortious interference with economic relations.  ARG now asks the court to dismiss the counterclaims under Rule 12(b)(6).

---

[1] ARG also named RC's owner, Reza Davachi, as a defendant, but the court dismissed Mr. Davachi for lack of personal jurisdiction.  (See Aug. 30, 2021 Order & Mem. Decision, ECF No. 34.)

## **FACTUAL ALLEGATIONS**

ARG manufactures nutritional and dietary supplements, which it sells through its website and through distributors, resellers, and retailers who are expressly authorized by ARG to sell in their brick-and-mortar locations or on the Internet ("Authorized Sellers"). ARG's exclusive distribution agreements with those Authorized Sellers ("Distribution Agreements") require the sellers to follow ARG's quality controls and be accountable to ARG for any quality issues. According to ARG, "By distributing products exclusively in this manner, ARG is better able to control the quality and integrity of its products and ensure that customers receive accurate information about them." (Compl. ¶ 24, ECF No. 2.) Citing the prevalence in the market of fake or compromised products bearing its trademark, and the harm such sales cause, ARG explains that its "distribution controls are intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the ARG Registered Trademarks by unauthorized sellers like [RC] who do not abide by ARG's quality controls." (Id. ¶ 60.) They are also "designed to protect consumers and prevent them from receiving poor quality and unsafe products." (Id. ¶ 73.)

The Distribution Agreements require Authorized Sellers to sell ARG products through certain channels and follow ARG's policies and procedures.[2] For instance, the sellers may only purchase ARG products from ARG directly or through authorized distributors, and, apart from selling to end users, they may only sell to ARG-approved resellers. ARG also requires inspections, disclosure of shipment problems, packaging standards, and audits.

---

[2] ARG describes its policies and procedures in more detail in paragraphs 65–70 and 76–90 of the Complaint.

ARG imposes additional requirements on authorized online sellers because "ARG products sold online are more susceptible to quality and authenticity problems as consumers cannot see the products before they buy them." (Id. ¶ 74.) Those rules require the authorized online retailers to sell ARG products through ARG-approved websites (for instance, the retailer's proprietary website rather than an online marketplace website on Amazon.com) and to use ARG-approved website interfaces, advertising, product descriptions, sales processes, customer feedback protocols, and the like.

ARG polices the sale of its products online. In 2020, during its regular monitoring, "ARG discovered a high volume of products bearing the ARG Registered Trademarks being illegally sold by [RC] on Amazon under the storefront name 'River of Human Health'" and RC's "Oasis of Health" website. (Id. ¶¶ 99, 102.) RC and its owner, former Defendant Reza Davachi, were previous ARG customers who were not approved for online sales.

Despite that lack of approval, RC says it "sells genuine ARG products that are not materially different from the first sale ARG products. RC has established and abides by legitimate quality control procedures for the storage and shipment of the ARG products. The products are sold with their original packaging and RC makes clear that it is a reseller of the goods." (Countercl. ¶ 11, ECF No. 37.)

ARG notified RC and Mr. Davachi that they were not authorized to sell ARG products online and demanded that they cease sales of products bearing ARG's registered trademarks. ARG sent three cease-and-desist letters between July 2020 and January 2021.

In its letters, ARG told RC that ARG owned the trademark and that RC was interfering with ARG's contractual relationships with the Authorized Sellers. ARG said RC would be tortiously interfering with ARG's Distribution Agreements if it continued to purchase products

bearing ARG's trademarks from Authorized Sellers for resale outside ARG's distribution channels.  ARG also threatened legal action if RC did not stop selling the products.  Despite receiving those communications, RC continued to advertise and sell the products.  ARG then filed this lawsuit.

## RC'S COUNTERCLAIM

According to RC's Counterclaim, ARG's Distribution Agreements constitute a group boycott (or concerted refusal to deal) in restraint of trade.  RC alleges that "ARG has illegally acquired, maintained, and exercised power in the Relevant Market through anticompetitive acts.  As a result, ARG has impaired rivals leading to the anticompetitive effects of lower output, higher prices, and fewer options for consumers."  (Id. ¶ 7.)  RC defines the "Relevant Market" as "the market for the sale (both first sale and resale) of non-prescription nutritional and dietary supplements within the United States."  (Id. ¶ 6.)

RC characterizes the Distribution Agreements as "unlawful vertical restraints of trade" that "have created barriers to entry, limited the supply and variety of products available, inhibited the growth and development of competitors, and artificially raised and maintained the price paid by consumers in the Relevant Market."  (Id. ¶ 30.)  RC elaborates a bit on its general description of antitrust harm, contending that

> ARG's anticompetitive behavior has led to at least the following harm in the Relevant Market: (1) reduced supply of non-prescription nutritional and dietary supplements, (2) fewer options for consumers for where and how to purchase non-prescription nutritional and dietary supplements, (3) the limitation of innovation from the entry and growth of competitors, (4) supra-competitive prices for consumers for non-prescription nutritional and dietary supplements, and (5) increased market dominance by ARG.

(Id. ¶ 19.)

RC also alleges personal harm.  The Distribution Agreements constitute "important means of acquiring ARG products" that deprive it of the ability "to re-sell genuine ARG

4

products," "to sell non-ARG nutritional and dietary supplements on [its] Amazon storefront," and to sell "the inventory that it had purchased." (Id. ¶¶ 21, 29.) According to RC, the group boycott has hindered RC's ability "to build its reputation and brand in some of the most important retail and online marketplaces," and RC has "obtained lower revenues than it would have obtained in a competitive market." (Id. ¶¶ 20–21, 29.) RC further alleges that its "market position is a sliver of what it could and would be in a competitive market, and it has not been able to bring new, efficient, and desirable consumer innovations to its customers because of ARG's conduct." (Id. ¶ 22.)

As for RC's tort claim, RC alleges interference with existing as well as potential economic relations in the form of "contracts and business relationships with distributors who sell it ARG products" and "consumers to whom it sells ARG products." (Id. ¶¶ 41-42.) RC asserts three "improper means" through which ARG interfered. First, ARG's Distribution Agreements violate antitrust laws and interfere with RC's ability to purchase ARG products from the Authorized Sellers for resale on RC's Amazon storefront and website. Second, ARG sent "abusive shutdown requests to Rez Candles['] website and Amazon store front" that "limit Rez Candles' ability to sell ARG goods as well as non-ARG products." (Id. ¶¶ 16, 44.) It appears that RC is referring to ARG's cease-and-desist communications. RC also says "ARG intentionally interfered … by shutting down or attempting to shut down Rez Candles['] website and Amazon store front." (Id. ¶ 43.) Finally, RC asserts that "harassing litigation" interfered with its economic relations. (Id. ¶ 44.)

In the motion to dismiss, ARG argues that the above allegations do not state a claim for violation of the Sherman Act, Utah's antitrust act, or tortious interference, and it asks the court to dismiss the entire Counterclaim.

## ANALYSIS

ARG first asserts that RC has not properly alleged a claim of group boycott (otherwise known as a "concerted refusal to deal") under Sherman Act § 1, and because analysis of federal antitrust law extends to the parallel Utah antitrust statute, ARG asks for dismissal of the state antitrust claim as well.  Second, ARG contends RC has not alleged use of "improper means" to interfere (an essential element of a tortious interference claim under Utah law), or that ARG's actions actually interfered with specific third-party relationships.

Under Federal Rule of Civil Procedure Rule 12(b)(6), the court must dismiss a complaint that fails to state a claim upon which relief can be granted. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations, quotation marks, and alteration omitted). Additionally, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" Id. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Twombly has particular relevance here because the Court addressed the question "of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act" and avoid dismissal under Rule 12(b)(6). Id. at 554–55.  The Court emphasized that a district court has "'the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" Id. at 558 (quoting Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n.17 (1983)).  As discussed below, RC's Counterclaim lacks that specificity.

A.   **Antitrust Claims**

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  RC asserts that the Distribution Agreements unreasonably restrain trade in violation of that provision.

ARG argues that RC has not adequately stated an antitrust claim because it has neither alleged antitrust injury (required to establish antitrust standing) nor alleged necessary elements of an antitrust claim (specifically, the product market, ARG's market power, and harm to interbrand competition).  ARG's challenge to RC's antitrust claim under the Utah statute relies on the same analysis, for the federal and statute statutes are essentially coextensive.[3]

1.   **Antitrust Standing**

RC must allege antitrust injury, defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  In other words, "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990) (emphasis in original).  Anticompetitive effects include, for example, barriers to market entry, reduced output, or supracompetitive prices.  William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 9:6 (Dec. 2021).

Here, RC complains that the Distribution Agreements prevent it from selling ARG products because it is not an authorized distributor or an authorized reseller with whom the

---

[3] The Utah antitrust statute, using language materially similar to § 1 of the Sherman Act, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal."  Utah Code Ann. § 76-10-3104(1).

distributors may deal.  It then offers vague and conclusory statements about the effects ARG's

actions have had on competition:

1. ARG's behavior "enable[d] ARG to continue to increase prices and reduce output of its nutritional and dietary supplements" and caused "lower output, higher prices, and fewer options for consumers."  (Countercl. ¶¶ 7, 13.)

2. "ARG's exclusionary conduct has the intended effect of sustaining ARG's market power, impairing the growth and entry of resale competitors in the Relevant Market, and has resulted in tangible harm to Rez Candles and the consuming public."  (Id. ¶ 18.)

3. "ARG's anticompetitive behavior has led to at least the following harm in the Relevant Market: (1) reduced supply of non-prescription nutritional and dietary supplements, (2) fewer options for consumers for where and how to purchase non-prescription nutritional and dietary supplements, (3) the limitation of innovation from the entry and growth of competitors, (4) supra-competitive prices for consumers for non-prescription nutritional and dietary supplements, and (5) increased market dominance by ARG."  (Id. ¶ 19.)

These allegations, says RC, provide "many examples of specific, factual instances of how

ARG's competitive behavior harmed the consuming public."  (Opp'n to Mot. to Dismiss

at 6, ECF No. 45.)

RC alleges an injury to itself, but, as explained below, its conclusory allegations do not

allege harm to competition.  The antitrust laws were created for "the protection of competition,

not competitors."  Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).  "'An antitrust

plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or

services, not just his own welfare.'"  Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1281 (10th

Cir. 2012) (quoting Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996)).

Accordingly, RC has not alleged antitrust injury.

### 2. Group Boycott

RC alleges the Distribution Agreements constitute a group boycott resulting in unlawful

vertical restraints of trade.  Vertical restraints are "imposed by agreement between firms at

different levels of distribution," as opposed to horizontal restraints, which are "imposed by agreement between competitors[.]" Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 730 (1988).

To determine whether RC has alleged a violation of Sherman Act § 1, the court applies the "rule of reason." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) ("The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of [Sherman Act] § 1."); Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977) (applying rule of reason to analyze vertical nonprice restraints in "franchise agreements between [a] manufacturer[] and retailers [with] provisions barring the retailers from selling franchised products from locations other than those specified in the agreements").[4]

The rule prohibits arrangements where the anticompetitive consequences of those arrangements outweigh their legitimate business justifications. SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 963 (10th Cir. 1994). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Cont'l T.V., 433 U.S. at 49, quoted in Leegin, 551 U.S. at 885.

First the court "asks whether the offending competitor … possesses market power in the relevant market where the alleged anticompetitive activity occurs." SCFC, 36 F.3d at 965. This

---

[4] In narrow circumstances, the court need not engage in a "rule of reason" analysis. "Some types of [restraints] 'are deemed unlawful per se.' The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). RC challenges a vertical restraint, and courts do not treat such arrangements as per se illegal. See, e.g., id. at 887 (the Court has "refus[ed] to adopt a per se rule for a vertical nonprice restraint because of the uncertainty concerning whether this type of restraint satisfied the demanding standards necessary to apply a per se rule") (citing White Motor Co. v. United States, 372 U.S. 253, 263 (1963)).

begins with identification of the relevant market.  Id. at 966.  After establishing the confines of the relevant market, the analysis switches to the question of whether the party has sufficient market power in the relevant market to control prices or exclude competition.  Id.  If those threshold requirements have been satisfied, the court looks to whether the restraint adversely affects competition.  See Ohio v. Am. Express Co., 138 S. Ct. 2274, 2284 (2018) ("The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure … to assess the restraint's actual effect on competition.") (internal citation, quotation marks, and alteration omitted).

ARG contends that RC's Counterclaim does not allege any of these requirements.  The court agrees.

a.   Relevant Market

To define the relevant market, the party claiming an antitrust violation must define both the product market and the geographic market.  Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1221–22 (10th Cir. 1986).  Generally, speaking, "[t]he product market consists of products 'found to be sufficiently substitutable,' and the geographic market encompasses 'the terrain in which competition takes place.'"  Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp., 846 F.3d 1297, 1312 (10th Cir. 2017) (quoting Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1071 (10th Cir. 2013)).  "'Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement.'"  Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1118 (10th Cir. 2008) (quoting Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir. 1978)).  Accordingly, "[f]ailure to allege a legally sufficient market is cause for dismissal of the claim."  Id.

Here RC defines the relevant market as "the market for the sale (both first sale and resale) of non-prescription nutritional and dietary supplements within the United States."  (Countercl. ¶ 6.)  ARG asserts that RC's bare bones definition is not adequate.

The definition of a product market must include information about "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Brown Shoe, 370 U.S. at 325.  See also, e.g., Westman Comm'n Co., 796 F.2d at 1221 (defining the product market "necessitates an examination of which commodities are 'reasonably interchangeable by consumers for the same purposes'") (quoting United States v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 395 (1956)).  The "reasonable interchangeability" of the product at issue concerns whether the product has a reasonably good substitute.  Cross-elasticity of demand is "an economic measure of the substitutability of two products."  Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1120 (10th Cir. 2014) ("A high cross-elasticity of demand indicates that products are substitutes; a low cross-elasticity of demand indicates that the products are not substitutes and, as a result, do not compete in the same market.").  See also, e.g., Bd. of Regents of Univ. of Okla. v. NCAA, 707 F.2d 1147, 1158 (10th Cir. 1983) (cross elasticity of demand means "the extent to which consumer preference shifts freely between two or more products"); Suture Express, Inc. v. Cardinal Health 200, LLC, 963 F. Supp. 2d 1212, 1222 (D. Kan. 2013) (the concept of cross-elasticity addresses "whether demand shifts from goods of one type to goods of a similar type in response to increases in price.").

RC does not provide any description, explanation, analysis, or legal theory to support its one sentence definition of the relevant market, but it contends nothing more is required. According to RC, "ARG demands that Rez Candles' pleading include a detailed identification of

11

'what specific products are in this market,' and 'analysis of this market,' and an explanation of 'why this market includes all reasonably interchangeable substitute products." (Opp'n at 8.)  RC describes this as an unnecessary "elaborate market analysis[.]" (Id.)  Relying on its one sentence allegation, RC concludes that it has "defined the market to include reasonably interchanged products with elastic demand," and then suggests that "[t]he parties' understanding and position regarding the relevant market will refine as they conduct discovery and employ experts." (Id. at 7–8.)

Although case law does not require an "elaborate market analysis," it does require more than RC's single factual allegation.  To avoid dismissal, "an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market." B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 171 (S.D.N.Y. 1995).  RC has not pled any facts or provided any explanation discussing the reasonable interchangeability of use and cross-elasticity of demand.  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand ... even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436–37 (3d Cir. 1997) (collecting cases) (emphasis added), quoted in Campfield, 532 F.3d at 1118.  See also, e.g., B.V. Optische, 909 F. Supp. at 171–72 ("Because a relevant market includes all products which are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.") (internal quotation marks and citations omitted).

RC's cursory definition of the relevant market does not satisfy the pleading requirements for this threshold element.  That alone is reason to dismiss its antitrust claim.

b.  Market Power

Even if RC has adequately alleged a relevant market, it has not adequately alleged market

power, another threshold requirement.  To succeed on a § 1 claim, a plaintiff must show that a

defendant can "wield 'market power'" within the relevant market.  Cohlmia, 693 F.3d at 1282.

Simply stated, "[m]arket power is the power to control prices or exclude competition."  Bd. of

Regents of Univ. of Okla., 707 F.2d at 1158.

In a vertical restraint agreement between a manufacturer and a distributor (as we have

here), the "manufacturer's ability to limit its distributorships may not be restricted … unless the

manufacturer possesses 'market power' with respect to the product whose distributorship

arrangements are being questioned."  Westman Comm'n Co., 796 F.2d at 1225.  "Whether

market power exists or can be exercised in the relevant geographic market depends upon the

existence of competing products to which a purchaser can turn when faced with relative price

increases."  Bd. of Regents of Univ. of Okla., 707 F.2d at 1158, quoted in Westman Comm'n

Co., 796 F.2d at 1226.  To make this determination, a court looks at two factors: the "reasonable

interchangeability of use to which two or more products can be put" and "cross-elasticity of

demand."  Id.  This includes evaluation of indicia of market power, such as "market share,

barriers to entry, the number of competitors in the market, market trends, and other relevant

considerations.  Of these pertinent factors, market share—i.e., percentage of the relevant

market—is a focal point."  Buccaneer Energy, 846 F.3d at 1315 (internal citation omitted).

RC points to allegations in ARG's complaint to show that ARG has a market share.  (See

Opp'n at 10 (citing Compl. ¶¶ 12-13, 20-21, 27-29).)  That point is not disputed.  The relevant

point is the extent of ARG's market share, which RC does not meaningfully attempt to describe.

At most, RC alleges that ARG has an "increased market dominance."  (Countercl. ¶ 19.)  A large

market share, however, is not determinative.  "Market share is relevant to the determination of the existence of market or monopoly power, but 'market share alone is insufficient to establish market power.'" Reazin v. Blue Cross & Blue Shield, Inc., 899 F.2d 951, 967 (10th Cir. 1990) (emphasis added) (quoting Bright v. Moss Ambulance Serv., Inc., 824 F.2d 819, 824 (10th Cir. 1987)).

RC does not address product interchangeability or cross-elasticity of demand at any level in its counterclaim.  Nor do RC's allegations refer to any indicia of market power.

That leaves the court with vague allegations of market power.  For instance, RC alleges that ARG "illegally acquired, maintained, and exercised power in the Relevant Market," "intended to maintain ARG's market power and otherwise enable ARG to continue to increase prices and reduce output of its nutritional and dietary supplements," "sustain[ed] ARG's market power," and "increased [its] market dominance." (Countercl. ¶¶ 7, 13, 18–19)  All of those allegations are highly conclusory.

RC again complains that the court should not require it to conduct a market analysis in its pleading.  But, as noted above, something more than conclusions is necessary to avoid dismissal.

The Tenth Circuit decision in TKO Energy Services, LLC v. M-I LLC, is illustrative. There, the district court dismissed an antitrust claim containing nothing more than conclusory allegations similar to those RC offers.  The TKO Energy panel affirmed dismissal because the plaintiff did nothing more than offer broad assertions of market power.  For example, the plaintiff alleged that the defendant "has acquired and is maintaining a monopoly" in the market and "has the power to control prices and exclude competition"; "substantial barriers to entry and expansion exist"; "prices were higher than they would have been in a competitive market"; "innovation has been stifled"; "the number and effectiveness of competitors have been

14

diminished"; two companies "dominated" the market and "largely control[led]" production; and two companies had a significant share of the market.  539 F. App'x 866, 872 (10th Cir. 2013). The court rejected those allegations as insufficient and dismissed because the plaintiff did not plead necessary supporting facts, such as who the defendant's competitors were, the market share of the defendant or its competitors, substantial barriers to entry, and what competitors were excluded.  Just as in TKO Energy, RC's counterclaim does not allege market power with any facts to support its conclusory allegations.

        c.  Harm to Competition

Even assuming RC alleged a relevant market and market power, it has not alleged harm to competition.

Antitrust law is designed to protect interbrand competition, defined as "competition among manufacturers selling different brands of the same type of product."  Leegin, 551 U.S. at 890, 895.  RC challenges a vertical restraint on intrabrand competition, which is "competition among retailers selling the same brand."  Id. at 890.

Typically, vertical restrictions of the type RC challenges support interbrand competition. "[W]hile vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, [who are] competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products."  Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 131 (2d Cir. 1978) (citing Continental T.V., 433 U.S. at 54).

The Tenth Circuit has articulated numerous reasons why the law favors intrabrand competition, i.e., refusals to deal:

> **There are several reasons** why it is procompetitive to permit a manufacturer to limit the number of outlets that distribute its products. A few are readily apparent.

**First**, when a manufacturer limits the number of its distributors, it may reduce its distribution costs by allowing each distributor to achieve economies of scale and to spread out fixed costs over a large amount of products. **Second**, refusals to deal may facilitate the entry of new manufacturers into the market. The prospect of limited intrabrand competition that results from restricted distribution may encourage distributors to make the investment necessary to carry a new manufacturer's product. **Third**, limiting the number of outlets that distribute a product may encourage distributors to provide promotional activities, consumer information, and product service. These activities may in turn lead to increased interbrand competition. When a manufacturer limits the number of retail outlets for its products, it ensures that competing sellers of its product will not get a "free ride," or benefit from the promotions or service provided by other distributors. **Finally**, restricting distribution can reduce transactions costs by permitting a manufacturer to deal only with distributors with whom it believes it can develop an efficient working relationship.

Westman Comm'n Co., 796 F.2d at 1227 (emphasis added) (internal citations omitted).  See also

Leegin, 551 U.S. at 890–92 (discussing competitive benefits of vertical restraints).

RC's relatively specific allegations focus on favored intrabrand competition.  For instance, RC alleges that ARG's actions have allegedly "prevent[ed] competitors like RC from succeeding in the marketplace by depriving them of access to first sale **ARG products** and preventing them from reselling **ARG products**" (Countercl. ¶ 12 (emphasis added).)  It complains that ARG's Distribution Agreements have "enable[d] ARG to continue to increase prices and reduce output of [**ARG's**] nutritional and dietary supplements."  (Id. ¶ 13 (emphases added).)

Despite the typical benefits of intrabrand competition, RC does not allege anything, general or specific, suggesting why the vertical restraint arrangement between ARG and the Authorized Sellers goes against generally recognized pro-trade benefits.  In fact, RC's allegations of harm to competition are general and conclusory:

ARG's anticompetitive behavior has led to at least the following harm in the Relevant Market: (1) reduced supply of non-prescription nutritional and dietary supplements, (2) fewer options for consumers for where and how to purchase non-prescription nutritional and dietary supplements, (3) the limitation of innovation from the entry and growth of competitors, (4) supra-competitive prices

16

for consumers for non-prescription nutritional and dietary supplements, and (5) increased market dominance by ARG.

(Id. ¶ 19.)  (See also id. ¶ 18 (ARG's conduct has "impair[ed] the growth and entry of resale competitors in the Relevant Market, and has resulted in tangible harm to Rez Candles and the consuming public"), ¶¶ 30, 38 (ARG's Distribution Agreements "have created barriers to entry, limited the supply and variety of products available, inhibited the growth and development of competitors, and artificially raised and maintained the price paid by consumers in the Relevant Market").)  The Counterclaim does not contain facts to fill in the gaps of those conclusory allegations.  Without more, RC fails to allege harm to competition.

### 3.  Conclusion

For all the foregoing reasons, RC fails to allege a cause of action under § 1 of the Sherman Act.  Because its state antitrust claim requires the same analysis, that claim fails as well.

### B.  **Tortious Interference Claim**

To establish a claim for tortious interference with economic relations, a party must show that: (1) "the defendant intentionally interfered with the plaintiff's existing or potential economic relations"; (2) "by improper means"; (3) "causing injury to the plaintiff."  Eldridge v. Johndrow, 345 P.3d 553, 565 (Utah 2015).

RC contends ARG interfered with its contracts through (1) "improper contractual provisions," (2) "abusive shutdown requests to Rez Candles website and Amazon store front," and (3) "harassing litigation."  (Countercl. ¶ 44.)  As explained below, none of those actions constitutes improper means.  Additionally, RC has not alleged facts establishing that the shutdown requests or litigation interfered with existing or potential economic relationships.

17

### 1. Improper Means

To allege "improper means," a party must allege "actions that are 'contrary to law, such as violations of statutes, regulations, or recognized common-law rules,' or actions that violate 'an established standard of a trade or profession.'" C.R. England v. Swift Transp. Co., 437 P.3d 343, 353 (Utah 2019) (quoting Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 308 (Utah 1982)).  Importantly, "a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage." Id. at 354.

The "improper contractual provisions" in the Distribution Agreements, the alleged "abusive shutdown requests," and the alleged "harassing litigation" do not constitute violations of a legal rule or an established trade or professional standard.

### a. "Improper Contractual Provisions"

RC alleges the Distribution Agreements are improper because they violate antitrust law.  But, as noted above, RC has not alleged an antitrust violation.  Accordingly, it has not alleged the improper means necessary to state a tort claim based on those agreements.

### b. "Abusive Shutdown Requests"

RC's allegations of "abusive shutdown requests" do not establish an improper means either.  RC refers to "shutdown requests to Rez Candles['] website and Amazon store front." (Countercl. ¶ 44.)  Based on a reading of RC's vague allegations (and with no elaboration in RC's brief), it appears RC is referring to ARG's cease-and-desist letters.  RC does not identify any law or standard that ARG's demands violated.

RC asserts that the law does not require it "to set forth a complete legal theory as to the specific law or standard that ARG violated through its repeated, improper shutdown requests to Rez Candles' online product listings."  (Opp'n at 14.)  To the contrary, RC must plead the

element of "improper means" by tying it to violation of a legal rule or an established trade or professional standard.  With no reference to a legal rule or standard (something RC should already know without resort to discovery), RC has not met its notice pleading obligation.

### c.   "Harassing Litigation"

RC alleges that ARG, by bringing this lawsuit (the "harassing litigation"), intentionally interfered with RC's existing and potential economic relations with third parties.  Although the Counterclaim is not altogether clear, it appears that RC is alleging two bases for its claim: (1) ARG is using the lawsuit to suppress competition in violation of antitrust law; and (2) ARG's lawsuit is an abuse of the judicial process.

### i.   *Sham Litigation*

ARG interprets the Counterclaim to allege that ARG is using sham litigation to suppress competition in violation of the antitrust laws.  In defense, ARG raises the Noerr-Pennington doctrine.

When a party is accused of using the legal process to restrain trade, the party may assert immunity under the Noerr-Pennington doctrine.[5]  "Those who petition government for redress are generally immune from antitrust liability."  Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993).  A petition for redress includes filing a lawsuit. Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).

---

[5] "The contours of [immunity protecting those who seek redress through the courts] developed in a line of antitrust cases, giving rise to the moniker, Noerr-Pennington immunity."  CSMN Invs., LLC v. Cordillera Metro. Dist., 956 F.3d 1276, 1282 (10th Cir. 2020).  That line of cases includes E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), United Mine Workers of America v. Pennington, 381 U.S. 657 (1965), and Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993).  Id.

That immunity does not extend to "sham" petitioning.  CSMN Invs., LLC v. Cordillera Metro. Dist., 956 F.3d 1276, 1283 (10th Cir. 2020).  "[U]nder the Noerr-Pennington 'line of cases … genuine petitioning is immune from antitrust liability, [but] sham petitioning is not.'" Id. (quoting BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525–26 (2002)) (alteration in original). RC, in response to ARG's assertion of Noerr-Pennington immunity, contends in its brief that the lawsuit is a sham.  To determine whether the lawsuit is a sham, the court asks: "(1) is the petitioning objectively reasonable? (2) and only if not, what is the subjective intent behind the petitioning?"  Id. at 1283–84.

In the first step, the court looks for litigation "so baseless that no reasonable litigant could realistically expect to secure favorable relief."  Prof'l Real Estate Inv'rs, 508 U.S. at 62.  "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail."  Id. at 60.

As for the second step, "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."  Id.  Under that portion of the analysis, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon."  Id. at 60–61 (internal quotation marks, citations, and alteration omitted).

RC's allegations do not satisfy the first part of the sham litigation test.  "Under the objective prong of the sham exception, … sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief."  Id. at 62.  This requires RC to allege facts showing that ARG "lacked probable cause to institute an

unsuccessful civil lawsuit and that [ARG] pressed the action for an improper, malicious

purpose." Id.

RC says it "has provided notice that ARG's litigation is objectively baseless." (Opp'n at

16.)  RC points to the fact that ARG also sued RC's owner (Reza Davachi), whom the court later

dismissed for lack of personal jurisdiction.  RC quotes the court's comment that ARG's

allegations "about his involvement are sparse or conclusory.'" (Id. (quoting Aug. 30, 2021 Order

& Mem. Decision at 10, ECF No. 34).)  Nothing in the court's order dismissing Mr. Davachi for

lack of personal jurisdiction supports RC's assertion that the claim against Mr. Davachi or RC is

"objectively baseless."  The merits of ARG's claim against Mr. Davachi was not at issue.

RC also unpersuasively suggests the content of ARG's complaint and RC's denial of the

complaint's allegations and assertion of seventeen affirmative defenses somehow shows that

ARG's lawsuit is objectively baseless. To begin, RC does not address the merits of ARG's

claims.  But even if ARG's complaint does not state a cause of action (and the court does not

express an opinion about the validity of ARG's claims), failure to state a claim does not equate to

objectively baseless litigation.  See CSMN Invs., 956 F.3d at 1287 ("[L]osing in the [district

court and appellate court] does not make their petitioning objectively unreasonable.").  In short,

nothing in the Complaint, Counterclaim, or RC's brief supports RC's assertion that ARG's

lawsuit is objectively baseless.

RC contends its antitrust allegations sufficiently plead "that ARG had an improper

motive for bringing and maintaining the litigation." (Opp'n at 17.)  In support, it cites to the

same vague, conclusory allegations upon which it relies to state a claim under the Sherman Act.

Because RC's allegations do not plead an objectively baseless lawsuit, the court need not address

the subjective part of the sham litigation test.  At any rate, those allegations do not support RC's

assertion in its brief that "ARG has little interest in a judicial ruling or government action regarding Rez Candles" or that ARG "is using the process of litigation to crush competition, squeeze out information regarding Rez Candles' suppliers, and send a threatening message to any other potential competitors."  (Id.)

In short, to the extent RC is alleging the litigation violates the antitrust laws, its allegations do not establish that the litigation was an improper means.

<em>ii.     Abuse of Process</em>

Although not addressed by the parties, RC's complaint appears to allege an abuse of the judicial process.  See Eldridge, 345 P.3d at 565 ("a plaintiff might bring a tortious interference suit alleging that the defendant's improper means of interference was an abuse of judicial process.").  But the Counterclaim and ARG's Complaint do not contain factual allegations supporting such a claim.

Utah courts refer to the tort as "malicious prosecution" or "wrongful use of civil proceedings."  Hatch v. Davis, 102 P.3d 774, 779 (Utah Ct. App. 2004).  Relying on the Restatement of Torts, they have articulated the elements of a wrongful use of civil proceedings claim:

> One who takes an active part in the initiation, continuation, or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if (a) he [or she] acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

Gilbert v. Ince, 981 P.2d 841, 845 (Utah 1999) (alteration in original) (quoting Restatement (Second) of Torts § 675).

Under the circumstances set forth in the Counterclaim, RC has not alleged a claim for wrongful use of civil proceedings.  As discussed above in the analysis of the "objectively

baseless" prong in the sham exception to <u>Noerr-Pennington</u> immunity, nothing in the Counterclaim plausibly supports the assertion that ARG filed this lawsuit "primarily for a purpose other than … securing the proper adjudication of the claim[.]"  <u>Id.</u>  To the extent RC asserts ARG's "harassing litigation" was an abuse of process, its allegations do not support its position.

### 2.  Interference

The Counterclaim generally alleges interference with existing as well as potential economic relations in the form of "contracts and business relationships with distributors who sell it ARG products" and "consumers to whom it sells ARG products."  (Countercl. ¶¶ 41-42.)  Even assuming the "abusive shutdown requests" and "harassing litigation" were improper means, RC does not allege any facts plausibly demonstrating that those actions interfered with its ability to sell to its customers or otherwise work with distributors in the sale of ARG or non-ARG products.  Because such interference is essential to the tort claim, that pleading failure is fatal to RC's tort cause of action as well.

### **<u>ORDER</u>**

For the foregoing reasons, the court grants ARG's Motion to Dismiss Counterclaims (ECF No. 38).  The court does so without prejudice, in order to allow Rez Candles an opportunity to allege counterclaims that satisfy the requirements of Rule 12(b)(6).  Rez Candles may file a motion seeking leave to amend its counterclaims, along with a copy of its proposed amended pleading, no later than 30 days from the date of this order.  If Rez Candles does not file

a timely motion, the court will dismiss the entirety of its Counterclaim with prejudice.

SO ORDERED this 4th day of April, 2022.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge